## Ex Parte Frank L. Snodgrass.

### No. 2447. Decided December 18, 1901.

**1.—Habeas Corpus—Right to.**

The provisions of the Code of Criminal Procedure, articles 171, 172, 151, 152, 164, 166, 167, contemplate that a person is entitled to the writ of habeas corpus not only in case of actual custody but also in case of any illegal restraint, and that any character or kind of restraint that precludes an absolute and perfect freedom of action on the part of relator authorizes such relator to make application to the Court of Criminal Appeals for release from said restraint.

**2.—Same—Contempt.**

When an attorney, who has been adjudged guilty of a contempt of court has been committed to the custody of the sheriff, and the sheriff, after arrest-

ing him, permitted him to go home to attend his sick child under a promise that he would not leave his child's sickbed except to go to his office and return, such attorney is under such restraint as that he is entitled to the writ of habeas corpus, actual imprisonment in jail not being a prerequisite to his right to the writ, nor to the jurisdiction of this court to hear the writ.

**3.—Contempt by Attorney in Argument.**

On the trial of a criminal prosecution of the State versus one G., there was a direct and palpable conflict between the testimony of the two main witnesses, one for the State and one for the defendant, client of this relator. The attorney for defendant, in his argument to the jury, stated that either the witness for the State, with whom he was unfriendly, or the witness for the defendant was mistaken or one of them had lied; whereupon the State's witness arose and stated to relator that he must not say that he had lied; and upon relator's repeating what he had said, and that he had nothing to take back, said witness struck relator and a fight ensued in the presence of the court and jury. The court adjudged relator guilty of contempt and fined him $50. Held, relator's argument was legitimate and not the subject of contempt and the judgment of the court finding him guilty of contempt and fining him was wholly unwarranted. Henderson, J., dissenting.

From Coleman. Original application to Court of Criminal Appeals for writ of habeas corpus, to be relieved from a commitment on a judgment and fine of $50 for contempt of court.

The case is stated in the opinion.

*B. D. Tarleton* and *Frank L. Snodgrass,* for relator.—Applicant being an attorney at law, engaged in the discussion of his client's cause before the jury, and his argument and language being pertinent to the issue involved and justified by the evidence before the jury, his exemption from any civil or criminal liability was absolute and essential to a free and fair discussion of and protection of his client's cause. 3 Am. and Eng. Enc. of Law, 2 ed., note 2, p. 294, and authorities; Hastings v. Lusk, 22 Wend., 413; 34 Am. Dec.; Hoar v. Wood, 3 Met., 197; Commonwealth v. Brownell, 145 Mass.; Tucker v. Heninker, 41 N. H.; Railway v. O'Hara, 150 Ill.; Bronson v. Loch, 74 Mich., 719.

*Rob't A. John,* Assistant Attorney-General, for respondent.

BROOKS, JUDGE.—Upon application of relator for the writ of habeas corpus, the same was granted by Presiding Judge Davidson, and made returnable before the court for hearing on November 13, 1901, at which time the Assistant Attorney-General filed the following motion to dismiss the application, to wit: "Now comes the State by the Assistant Attorney-General, and would show the court that the applicant herein was ordered by the district judge committed to jail pending the payment of the fine of $50 assessed against him for contempt of court, and that said applicant was never by the sheriff committed to jail, so the State is credibly informed and believes, but was by the sheriff admitted on parole, and permitted to be enlarged, upon his promise to protect him in the premises; and said applicant was beyond the custody of the sheriff, and not within the jail of said Coleman County, before this court admitted him upon bail, as shown by the record herein. Wherefore the

State would show the court that, by reason of the enlargement of the applicant, this court is without jurisdiction to hear this application, and the State moves the court that this application be dismissed." The judgment of the court finding applicant guilty of contempt was entered on September 11, 1901, and the commitment was issued on the 26th day of September. The writ of habeas corpus was granted by this court on October 7th, applicant being admitted to bail in the sum of $200 pending the disposition thereof. Relator, Frank L. Snodgrass, being sworn, stated substantially that, some days after the court fined him, judgment was entered by the court, and upon said judgment commitment was issued; that the sheriff met relator upon the streets, and arrested him on said commitment. Thereupon relator requested the sheriff to appoint some one or go himself with relator to relator's house, as his child was very sick with diphtheria, and relator could not with safety ask the neighbor ladies to wait upon his child with a contagious disease. Relator's wife was dead, and there was no one to properly care for the child besides himself. The officer informed relator he would not go himself, nor appoint anyone, but relator could go home, if he would promise that under no circumstances or conditions would he leave the bedside of his child, except to go to relator's office and back. Relator promised upon his honor to comply with the conditions imposed upon him, which he did. While this character of enlargement, if it be termed such, was in existence, relator applied to this court for the writ of habeas corpus, which was granted, and he was released on bond. It will be noted this is an original application for the writ of habeas corpus, and not an appeal from an order refusing bail; hence we apprehend the rules covering the same are somewhat different, in reference to the confinement or imprisonment.

· Article 170, Code of Criminal Procedure provides:

"The same power may be exercised by the officer executing the warrant (and in like manner) in cases arising under the foregoing articles as is exercised in the execution of warrants of arrest according to the provisions of this code.

"Art. 171. The words 'confined,' 'imprisoned,' 'in custody,' 'confinement,' 'imprisonment' refer not only to the actual, corporeal, and forcible detention of a person, but likewise to any and all coercive measures by threats, menaces or the fear of injury whereby one person exercises a control over the person of another and detains him within certain limits.

"Art. 172. By 'restraint' is meant the kind of control which one person exercises over another, not to confine him within certain limits, but to subject him to the general authority and power of the person claiming such right.

"Art. 173. The writ of habeas corpus is intended to be applicable to all such cases of confinement and restraint, where there is no lawful right in the person exercising the power, or where, though the power in fact exists, it is exercised in a manner or degree not sanctioned by law."

Article 154, Code of Criminal Procedure, requires that "every pro-

vision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy and protect the rights of the person seeking relief under it." Articles 151, 152, 164, 166, 167, Id., contemplates that a person is entitled to the writ not only in case of actual custody, but also in case of any illegal restraint. Article 172 states that by "restraint" is meant the kind of control which one person exercises over another, not to confine him within certain limits, but to subject him to the general authority and power of the person claiming such right. We think this article alone is decisive of the contention, and that the State's motion should not prevail. We deem it unnecessary to enter into a long discussion of these articles, but suffice it to say that any character or kind of restraint that precludes an absolute and perfect freedom of action on the part of relator authorizes such relator to make application to this court for release from said restraint. It certainly can not be insisted that, if relator is illegally arrested (if he is illegally arrested), he must be placed in jail, and thereby be subjected to an additional outrage, before he can apply to this court for the writ of habeas corpus. The motion of the State to dismiss the application is overruled.

The following, in substance, are the facts upon which the commitment was based: Relator was an attorney at law, and engaged in the practice thereof in the town of Coleman, and was representing his client in the trial of Bob Gatlin, and in the course of his speech before the jury used such language that the court fined him for contempt. The judgment of the court is as follows:

"State of Texas, County of Coleman.—September 11, 1901. It is considered and ordered by the court that F. L. Snodgrass be, and he is hereby, adjudged to be in contempt of this court, in this: That during the progress of his argument to the jury in the case of the State of Texas v. Bob Gatlin, and in open court, said F. L. Snodgrass, in discussing the testimony of witnesses H. N. Beakley and J. M. Crawford, who testified in said cause, with reference to said two witnesses stated and said to the jury, and in the presence and in the hearing of the court, and in the presence and hearing of the witness, in substance and effect, that either Beakley or Crawford (meaning the aforesaid witnesses) were mistaken, or one of them had lied. That H. N. Beakley, one of said witnesses, upon hearing said statement of F. L. Snodgrass, arose and stated to Mr. Snodgrass that he must not say that he (Beakley) had lied, whereupon said Snodgrass turned toward said Beakley, and, in an excited voice and manner, pointing and waving his hand toward Beakley, stated and said, 'I stated that either you or Crawford was mistaken, or one of you had lied, and I have nothing to take back,' which language and conduct on the part of said Snodgrass provoked said H. N. Beakley, and caused him in open court, and in the presence of the court and jury, to commit an assault and battery upon said Snodgrass; and for which language and conduct on the part of said Snodgrass, in provoking such assault, he is adjudged guilty of contempt of

this court, and fined in the sum of fifty ($50) dollars. And it is further ordered and decreed that said Snodgrass be, and he is hereby, committed to the jail of Coleman County, Texas, until such fine and all costs is paid. It is further ordered that the clerk of this court forthwith issue a writ of commitment to the sheriff or any constable of Coleman County, Texas, commanding such officer to take into custody and commit to jail said F. L. Snodgrass until said fine and all costs are fully paid." We find from an inspection of the affidavits filed both by the State and relator that the foregoing judgment is substantially supported by the affidavits. The affidavit of the trial judge, which contains some additional facts, is as follows: "I was presiding judge in the trial of the case, State of Texas v. J. M. Gatlin, at September term, 1901, District Court, Coleman County, Texas. F. L. Snodgrass represented the defendant on the trial of said case. H. N. Beakley was a witness for the State in said case. Snodgrass, in his speech to the jury in said cause, and in discussing Beakley's testimony in said cause, made use of the language attributed to him in the judgment for contempt. His manner, conduct, and tone of voice at the time he used the language attributed to him in said judgment, and especially at the time he replied to Beakley, was bantering, threatening, and exasperating to a gentleman. I knew nothing of Beakley's presence in the courtroom until he addressed Snodgrass as recited in said judgment. At the time he addressed Snodgrass, I noticed him take a seat just inside the bar, and some fifteen feet or more from Snodgrass. He had not more than taken his seat when Snodgrass replied as stated in the judgment, and, by the time he got his reply out, Beakley, with a spring, was on him, and struck him. The whole thing occurred in such short time that I had no opportunity to interfere and stop it. I saw nothing in Beakley's hand when he struck Snodgrass, nor did I see any weapons on his person, or any attempt on his part to draw a weapon, though I afterwards learned that a pistol was taken out of his pocket after the row. At the time Beakley seated himself just inside the bar he was within four or five feet of Mr. Little, stepfather of Snodgrass, and only a short distance from Donald Cameron, county attorney, and, as I am informed, cousin to Snodgrass, and not very far from Judges J. C. Randolph and C. H. Jenkins. As soon as I had the fight stopped, Mr. Snodgrass resumed his argument, and started to repeat, as I thought, his statements with reference to Beakley, when I told him to stop that course of argument; and, he having shown a disposition to persist therein, I told him if he repeated it I would punish him. (Do not remember the character of punishment.) I did not prohibit him discussing legitimately Beakley's evidence, but directed him not to repeat the statements that had provoked the row. As soon as order was restored I fined both Beakley and Snodgrass, but the judgments were not then entered, nor the writ then issued. I prepared both orders and the writ of commitment in this case, because the district attorney requested me to prepare the order, and the clerk told me he did not know how to draft the writ if the ordinary form of commitment

would not answer. I did not draft the commitment in the Beakley case because I heard him tell the clerk not to issue on the judgment, but to call on him when he wanted the fine, and he would pay it. At and prior to this row in court I knew from common street talk in the town of Coleman that certain men, including F. L. Snodgrass, on the one part, and certain men, including Beakley, on the other part, were unfriendly; and it was also known to me that it was commonly talked in Coleman that some day there would be a wholesale killing between those parties, should the matter ever start. [Signed] John W. Goodwin."

It will be noted from this affidavit, in addition to confirming the statements as contained in the judgment, it says "that relator's manner, conduct, and tone of voice at the time he used the language attributed to him in said judgment, and especially at the time he replied to Beakley, was bantering, threatening, and exasperating to a gentleman." It is not made to appear that relator knew Beakley was in the courtroom at the time of the argument, until Beakley stopped relator; and we do not think the statement in the affidavit of the trial judge as to the manner in which the statement was made adds anything to the question of contempt or no contempt. We also note the latter clause of the affidavit, to the effect that there was common street talk in the town of Coleman that certain men, including relator, on the one part, and Beakley, on the other part, were unfriendly, and that some day the parties would meet, and that there would be a wholesale killing between these parties. Unless the evidence before us should show that relator was attempting to provoke Beakley to a breach of the peace in the courtroom at the time of the argument, we could not consider said circumstances as going to illustrate or prove the intent of the relator. The mere fact that it was common street talk would not be evidence of applicant's intent, since common street talk is not evidence, but bare rumor. It is also made to appear by the undisputed affidavits that H. N. Beakley and J. M. Crawford testified in the case of Gatlin, then on trial; that their testimony was an exact cross, one of the other (that is, Beakley swore that he did not know the purpose for which certain money was being paid, which was a material inquiry in the trial, while Crawford swore that he did know). Now, the question arises, does the matter set up in the judgment make contempt of court? We are of opinion that it does not. In order to be contempt of court, the trial court must have not only jurisdiction of the person of the relator, but he must also have jurisdiction of the subject matter, and to render the particular judgment rendered. He had jurisdiction of relator, but he did not have jurisdiction of the subject matter, because he did not have the power or legal authority to enter the judgment against relator for the statements made as contained in the judgment. If he did, then it would destroy relator's right to argue the cause of his client in the courts of justice. It is a constitutional right guaranteed everyone tried in the courts of this State to be heard in person and by counsel; and certainly where two witnesses testify, one for and the other against a certain proposition,

showing an absolute and unqualified contradiction, there is but one of two conclusions to be drawn,—that one or the other testified falsely, or one or the other is mistaken. Relator's argument seems to have been charitable enough, placing it in the alternative. No other conclusion could be drawn from said contradictory statements but that one had testified falsely, or had been mistaken. This seems to have been a strong circumstance in the trial of the case, and certainly relator not only had the right, but it was his duty to his client, to comment upon and make manifest the fact that Crawford, defendant's witness, had told the truth, and that Beakley had not told the truth. Courts will look with much allowance upon the zeal and partisanship of counsel representing their clients in the courts. Without zeal, and without an honest and fervent desire to have everything done and to do everything that can be done within his power that is honorable to promote the interests of his client, and secure him a fair and impartial trial, the object of counsel would be destroyed, and the bar would soon fall into disrepute. In Duncan's case, 42 Texas Criminal Reports, 661, 2 Texas Court Reporter, 402, a question very similar to the one now under discussion was before us; and, among other things, we said: "We wish to say that the power of the court is official,—judicial, and not personal; and the relations of court and attorney are correlative. Courts may, will, and should enforce judicial power and functions when necessary; yet this must be done in a manner sanctioned by law, and in consonance with judicial dignity, and with due regard to the rights of parties to be affected. Attorneys are bound and will be held to obey legal orders of courts; yet the court should invoke its judicial authority under the law, and in obedience thereto. The relationships of court and attorneys, bench and bar, are reciprocal, and each, in their proper sphere, is clothed with powers, rights, and privileges which are to be recognized and respected by the other. These relations should be recognized and respected alike by the bench and bar, and, being carefully kept in view and followed as rules of action and conduct, will avoid friction." We would not be understood as holding that the trial court has not the right to maintain the decorum of the courtroom, nor would we be understood as holding that the court could not require relator's argument to be limited to the facts in evidence, or limit his address to the jury to rational, decent, and decorous deductions from the facts in evidence. Only this limitation, and nothing more, can be placed upon arguments of attorneys by the trial court. We are at a loss to know how relator could have commented upon the testimony of the conflicting witnesses otherwise than as he did. Perhaps relator could have avoided placing the testimony of said witnesses before the jury as either a lie or mistake, by saying that one of the parties was mistaken. This would still have left the jury to infer, if they desired to do so, that it was a willful mistake, and hence a lie. Be this as it may; it was a legitimate character of argument to be used in the trial of the case, as disclosed by the affidavits on file. Courts must not attempt to evade the province of counsel, and dictate as to the

character of argument to be made upon any given state of facts, other than as indicated above. We do not think relator violated either the letter or spirit of the law with reference to contempts; but, on the other hand, we think his argument was legitimate and germane to the facts being discussed, and the infliction of the fine by the trial judge was wholly unwarranted by the law and facts adduced upon the trial hereof. An inspection of the judgment shows the injustice thereof.

Relator is accordingly discharged.

*Relator discharged.*

HENDERSON, JUDGE (dissenting).—When the relator applied for the writ of habeas corpus, as appears from the testimony, he was not in jail under the commitment, but had the liberty of the town, under an arrangement with the sheriff of Coleman County. This, I think, was an escape, and the motion of the Assistant Attorney-General ought to have prevailed, and the application should have been dismissed. The writ required the sheriff to confine the relator in the jail of Coleman County in default of the payment of the fine of $50 assessed against him for contempt. This he never did, but permitted him to go at large. Under the authorities this was an escape. See 11 Am. and Eng. Enc. of Law, p. 265, subdiv. 3; Owens v. State, 32 Texas Crim. Rep., 373. True, as observed in the opinion, the writ of habeas corpus applies to every character of restraint. Still it occurs to me that, where a prisoner seeks to be discharged by the writ under a judgment and commitment of the court, he must show an actual commitment in accordance with the order. If he is merely at large, although under some species of constraint, I do not believe the writ will lie. The mandate of this court operates directly upon the officer holding the prisoner. Ex parte Erwin, 7 Texas Crim. App., 288. In this case there was no officer holding the relator, and in order to have confined the relator under the original commitment, I believe the officer would have had to obtain a new writ. He certainly would have been compelled to rearrest the relator under the former writ.

As to whether or not the court had the power to treat as contempt the conduct of the relator as set out in the judgment, I need only refer to my views expressed in the dissent in Ex parte Duncan, 42 Texas Criminal Reports, 661, 2 Texas Court Reporter, 402. The alleged contempt here was in the face of the court, and there is no question but that the court had jurisdiction of the person of the relator at the time. Did it have the power to treat the particular conduct of the relator on the occasion as a contempt of court? I believe the language attributed to relator in the judgment was tantamount to telling the witness Beakley that he had lied. Of course he did not intend to apply this language to his own witness, and when he told the jury that Crawford (his own witness) or Beakley (who testified against him)—one or the other—was mistaken or had lied, it was meant for Beakley. When Beakley protested, relator turned toward him in an excited voice and manner, and, pointing and waiving his hand toward said Beakley, repeated the accusation, and, in addition,

stated that he had nothing to take back. All this transpired in the presence of the court, and the judge based his action on his own personal knowledge, not only as to the language used, but as to the manner of the relator. The judicial eye witnessed the act, the judicial mind comprehended all the circumstances of aggravation, provocation, or mitigation, and I do not believe his judgment can be attacked by affidavits; nor does it require extraneous support in order to render it effective. That such language is calculated to provoke a breach of the peace, I, have no doubt. At the same time, I would not be understood as curtailing the right of all legitimate debate. An attorney has at all times the right, and he should be untrammeled, to criticise the testimony of witnesses against him; but, if he would be severe, he must be parliamentary at the same time. I do not believe that it accords with the proprieties of the court room to apply to a witness the epithet of liar or scoundrel, especially if, under the circumstances, this language is calculated to, and actually does, provoke a breach of the peace. But, however that may be, the court below had jurisdiction of the subject matter of the contempt, and if the conduct of the relator as set out in the judgment could, under the circumstances, constitute a contempt of court, I do not believe it is competent for this tribunal to try the case de novo, and set aside the judgment on evidence contradicting the record.